## THE WILLIS L. KING. THE SUPERIOR CITY. Petition of INTERSTATE S. S. CO.

(District Court, W. D. Wisconsin. January 17, 1923.)

**Collision ⬬➟40—Meeting steamships both held in fault.**

A collision in Lake Superior at night btween the steamships Superior City and Willis L. King, meeting nearly head and head, *held* due to faults of both vessels; the King being in fault in that, after an exchange of signals for passing starboard and starboard, and when the vessels were one-half to three-quarters of a mile apart, she assented to a signal from the Superior City for passing port to port, but did not change her course accordingly, and the Superior City being in fault in that, when the failure of the King to so change her course became apparent, she did not at once slow or stop as required by pilot rule II for the Great Lakes.

In Admiralty. Proceeding by the Interstate Steamship Company, as owner of the steamship Willis L. King, for limitation of liability for collision between the King and the Steamship Superior City. Fault for collision determined.

Holding, Masten, Duncan & Leckie, Frederick L. Leckie, and L. C. Hinslea, all of Cleveland, Ohio, and Kirlin, Woolsey, Campbell, Hickox & Keating and Ira A. Campbell, all of New York City, for petitioner.

Kelley & Cottrell, of Cleveland, Ohio, and Andrew Nelson and John Cedergren, both of Duluth, Minn., for claimants.

LUSE, District Judge. These proceedings arise out of a collision which occurred August 20, 1920, shortly after 9 o'clock p. m., between the steamer Willis L. King, belonging to the Interstate Steamship Company, petitioner, and the steamer Superior City, belonging to the Pittsburgh Steamship Company, about 4 or 5 miles southeast of Whitefish Point, in that part of Lake Superior known as Whitefish Bay. As a result of the collision the Superior City sank with its cargo, and of the 33 persons on board but 4 appear to have been rescued, among whom were the master and mate, who were navigating the vessel at and just prior to the collision. The owner of the King commenced these proceedings; the King was appraised at $635,434 and bond given. Claims were filed with the commissioner appointed to receive them aggregating upwards of $1,100,000.

Upon the hearing it was conceded that the owner of the King was entitled to limitation of liability, and by consent the hearing was confined to the trial and determination of the question of fault in causing the collision. It appears that the King, a vessel of the ordinary lake bulk freight carrier type, 600 feet long, was bound up Lake Superior from the Soo, light, her course N. W. ¾ N., and running at the rate of a scant 12 miles per hour. She had been followed from the Soo by the steamer Midvale, a ship of about the same size as the King, of different ownership and management, and which was slowly overtaking the King, running on the same course, but about a quarter to

a half mile westerly of the King, and as they approached the point of collision the latter was about 4 points off the Midvale's starboard bow. At the time of the collision the Midvale's bow was about opposite a point amidship of the King.

The Superior City, also a bulk freight carrier, 448 feet over all, with 48-foot beam, laden with iron ore, was down-bound, running at a speed of about 10½ miles per hour. Her course prior to any changes made on account of the King is not entirely clear. The testimony here indicates it as S. E. by S. ¼ S., while on a hearing before the government inspectors her master gave it as S. E. ½ S. She was followed by the steamer Turner, also down-bound, ore-laden; the latter being about one mile astern and about ¼ point off the starboard quarter of the Superior City.

The up-bound vessels had encountered some mist some miles southeasterly, and the down-bound boats encountered some fog some distance northwesterly of the scene of the disaster; but as they approached the weather was clear, and though the night was dark, they picked up one another's lights without difficulty at a distance of about 3 miles. They were thus approaching one another at a rate of about 22 miles per hour, or a mile in less than 3 minutes. While there is disagreement as to the relative bearings of the Superior City and the King with reference to one another at the outset, the Superior City placing the King slightly on the former's port bow, but in a position of head and head or nearly so, while the King places the Superior City well over the former's starboard bow, and in a position for a logical starboard to starboard passing, it is manifest that there was nothing unusual in the situation until just prior to the collision, and that the disaster could not have occurred without serious fault on the part of one or both the vessels.

The testimony from the members of the crew of the colliding boats is in irreconcilable conflict. The master and mate of the Superior City support the theory of the claimants, who allege:

"While on this voyage and on her course from Whitefish Point to Point Iroquis, the lights of two up-bound steamers, one of which later proved to be the Willis L. King, were sighted ahead of the Superior City and several miles distant; the lights of the steamer which later proved to be the Willis L. King bearing a trifle on the port bow of the Superior City. * * * When the steamers Superior City and Willis L. King were a proper distance apart, the Superior City blew a one-blast passing signal to the said steamer King, which said passing signal was answered promptly by the said steamer King with one blast, whereupon the course of the Superior City was altered slightly to starboard. A short time later it was noticed by those in charge of the Superior City that the said steamer King was apparently not porting in accordance with her passing agreement, whereupon, while still at a safe distance for passing, a second one-blast passing signal was blown by the said steamer Superior City, and was again promptly answered by one blast from the said steamer King; the Superior City's course being altered still further to starboard in accordance with her second one-blast passing signal. Later on, as the Superior City was swinging to starboard, it appeared to those on board said steamer that the said steamer King was swinging to her own port and was following the Superior City around, whereupon the Superior City blew the King a third one-blast passing signal, together with an alarm signal, and the Superior City's helm was at approximately the same time thrown hard aport. This third one-blast passing signal was answered by a

third one-blast passing signal from the said steamer King, and about the same time the said steamer King apparently began swinging to her starboard, but, as it turned out, too late to avoid collision, and about 9:10 p. m., Eastern standard time, the bow of the King struck the port side of the Superior City about abreast No. 8 hatch, head on, and at high speed. * * * "

On the other hand, the officers and a large number of the crew of the King support the allegations of the petition, which are as follows:

"On the 18th (sic?) day of August, 1920, said steamer Willis L. King * * * was proceeding across Whitefish Bay on her usual course for Whitefish Point. That when about five or six miles below Whitefish Point the lights of a down-bound steamer, which afterwards turned out to be the Superior City, were made a little to starboard, and as the boats continued to approach each other the Superior City blew a passing signal of two blasts, to which the King responded with two blasts and starboarded accordingly. In a short time the Superior City sounded another signal of two blasts, and again the King responded with two blasts and starboarded some more, * * * and continued thus until the Superior City suddenly began to swing across toward the King, whereupon an alarm signal was blown by the King, followed by a two-blast whistle, and her engines were stopped. The Superior City answered with a one-blast signal, and continued swinging across the King's bow, whereupon * . * * the King's helm was thrown hard aport and a one-blast whistle blown, * * * the engines were worked full speed astern, and an alarm signal blown. * * * The Superior City continued across the King's bow at high speed and swinging on a port helm until her port side, near the boiler house, struck the bow of the King. * * * "

The testimony from the officers of the Superior City is further to the effect that, when that vessel and the King were about 1½ miles apart, the mate of the Superior City was in charge of its navigation; that he observed all of the running lights of the King, including the latter's green and red side lights, indicating that the vessels were in a position of head and head, or nearly so, slightly off the Superior City's port bow; and that thereupon the Superior City blew a single-blast passing signal, which was promptly answered by the King, and the course of the Superior City directed to starboard from one-quarter to one-half point. The mate observed that the King was not navigating in accordance with the claimed port to port passing agreement, and testifies that he noticed that the position of the King's range and head lights opened up slightly; the head light changing to a position westward of the range light. This indicated clearly that the King was navigating directly contrary to the alleged agreement and directing her course to port. The mate then called the master of the vessel into the pilot house, directed his attention to the lights of what proved to be the King, and said, "Look how that fellow is heading on us," and the master, without further questions, took charge of his boat, made his observations of the approaching vessels, the King and the Midvale, but gave no orders until the Superior City and King were about one-half to three-quarters of a mile apart, when a second one-blast passing signal was blown by the Superior City, answered promptly by the King, and the helm of the Superior City was "ported some more." The Superior City continued under a ported helm until she and the King were about one-quarter mile apart, at which time the King was estimated to be from one-half to three points on the Superior

City's port bow, with all her running lights still visible, when the Superior City blew an alarm of five or more short blasts, followed by a third one-blast passing whistle, which the King answered with an alarm, followed by one blast, and thereupon the helm of the Superior City was thrown hard to port and the vessel swung rapidly to a course nearly at right angles with her original course, and the collision occurred; the stem of the Superior City striking the port side of the Superior City aft of admidships. Just prior to the impact the helm of the Superior City was thrown hard to starboard, with a view to swinging her bow to her port side, and thus more nearly parallel the courses of the colliding vessels, and this movement had just about commenced when the impact occurred. The angle of collision is claimed to have been about 45 degrees. The claim of the Superior City is that the King failed to give way; in other words, "was hogging the course," as it is known in common parlance. The evidence from the decks of the Superior City, however, quite clearly shows that continuously after the first passing signal the King was directing her course to her own port. During all of the approach and up until the time of the impact of collision the Superior City was operating at full speed ahead. In short, the claim of the Superior City is that the two steamers were meeting "head and head," and that she first determined to pursue this course, indicated her intention by one blast of her whistle, and repeated this signal twice, and that the King, while answering the signal, failed to operate in accordance therewith, and that this caused the collision.

On the other hand, the evidence from the King is to the effect that at all times until just prior to the impact of collision the vessels were in a position starboard to starboard, their green side lights exposed to one another, and that when the boats were about one mile apart the Superior City blew a two-blast passing signal, which was answered by the King; that when the vessels were about one-half mile apart this signal was again exchanged; that when the Superior City was about one-quarter mile distant, and located from 3 to 5 points off the starboard bow of the King, the master of the King, who was in charge of the vessel, noticed that her range lights began to close up, indicating a change in her course toward the King, that the Superior City's red light came into view, and that the King immediately stopped her engines, blew an alarm signal, followed by two blasts, shortly after which the Superior City blew a single blast, whereupon the King's engines were thrown full speed astern, her helm thrown hard to port, the King answered with one blast, and almost immediately the collision occurred; the stem of the King colliding with the port side of the Superior City aft of amidships at a broad angle of about 6 points or 67 degrees. In other words, the claim of the King is that the Superior City, having a perfect starboard to starboard agreement with the King, and when distant only one-quarter of a mile from the King and in a position of perfect safety, projected herself across the course of the King into inevitable collision. In addition it is claimed by the King that upon the first exchange of two blasts her course was directed one-half point to port, and upon the exchange of the second two-blast sig-

nal her course was again directed one-half point to port, in accordance with the two-blast passing agreement.

Fortunately, for a correct solution of this controversy, there are a number of facts, which are entirely or substantially undisputed, which, together with the testimony of the disinterested witnesses from the decks of the Midvale and the Turner, clearly indicate that the theory of neither side to this controversy is acceptable in its entirety. It is satisfactorily established by the navigating officers of both the Midvale and Turner that as the Superior City and King approached one another, and about the time the first signals were exchanged, they were in appropriate relative positions to pass starboard to starboard under two-blast passing signals. The Turner, which was westerly of the Superior City, had the King slightly on its port bow and the Midvale slightly on the starboard bow. After the collision, which occurred when the Turner was about a mile away, the Turner directed her course somewhat to starboard and came down and stopped at the scene of the collision between the King and the Midvale. Likewise the captain and mate of the Midvale evidently expected from the relative positions of the Superior City and King that they would pass starboard to starboard, and I am convinced that the first passing agreement between the Superior City and the King was a two-blast starboard to starboard one. Both the captain and the mate of the Midvale testified to hearing a two-blast passing signal from ahead, which was answered by the King, and both testify that the signal came from ahead before the lights of the Superior City and Turner came into view. Nevertheless, in view of the fact that the testimony of every one who testifies on the subject is that there were two exchanges of passing whistles prior to the one in connection with which an alarm was given, and the two-blast agreement testified to by the Midvale witnesses was quite clearly the second one preceding the signal which was given in connection with an alarm, I am well satisfied that the two-blast signal testified to by the Midvale witnesses as having been exchanged when the King and the vessel approaching it were some 2½ miles apart was in fact the first exchange between the Superior City and King, testified to by both the Superior City's witnesses and those of the King.

Correct estimate of distance upon water, particularly at night, is extremely difficult, and that the Midvale witnesses estimate distances greater than the witnesses of the Superior City and the King is clearly indicated by the fact that the Midvale's witnesses place the signal accompanied by an alarm from the Superior City at a time when the colliding vessels were one-half mile apart, and the passing signal exchanged next previous to that at a time when the colliding vessels were 1½ miles apart, while both the Superior City's and King's witnesses place these two signals at a time when the colliding vessels were one-quarter of a mile and one-half to three-quarters of a mile apart, respectively. The logic of the situation, together with the direct testimony of the Midvale's witnesses in corroboration of that of the King, supplemented by the testimony of the mate of the Superior City to the effect that the King's range lights then commenced to indicate that the latter was directing her course to port, establishes the fact that a two-

blast passing agreement was consummated in the first instance. It is undisputed that all of the passing signals were initiated by the Superior City. The second passing signals were exchanged when the vessels were one-half to three-quarters of a mile apart.

Without stopping to analyze the conflicting statements of the witnesses, and merely referring to the fact that the master of the Superior City had taken over her navigation from the mate, that, had the intention of the Superior City remained to pass the King starboard to starboard, as indicated by their first exchange of signals, there would have been little or no occasion for a second signal, the direct testimony of the officers of the Midvale to the effect that the second passing signal from the Superior City was a single blast, answered by the King, together with the testimony from the Turner that prior to the "swing" of the Superior City to starboard (later alluded to more fully) the latter vessel was closing in on the Turner's course, I conclude that the second passing signal from the Superior City was a single blast, answered by the King. The courses of the two vessels prior to any change by reason of their approach to one another were slightly convergent, and at the time of the establishment of this port to port passing agreement they were somewhat nearer to end on, or "head and head," than when the two-blast signals were exchanged; nevertheless I am convinced that each boat had the other on its starboard bow, that they were in relative positions propitious for a starboard to starboard passing, and that there was no necessity for any change. However, the King gave its assent to the change, and, if initiating such change were a fault on the part of the Superior City, the King concurred in it, and it became incumbent upon the latter to direct her course accordingly. This was not done, and in this the King was at fault. Had she promptly and vigorously directed her course to starboard, the collision would not have occurred. Instead, the King directed its course one-half point to port according to her own witnesses, and this is corroborated by the Midvale's mate, who testified in substance that just prior to the collision the King was nearer to the Midvale than theretofore. This is deemed decisive of the King's fault.

Did fault of the Superior City contribute to the collision? That this boat promptly directed its course to starboard in accordance with a single-blast signal is established. She proceeded on a ported helm until the two vessels were one-quarter of a mile apart. When one-quarter of a mile apart the Superior City blew an alarm whistle, followed by a single-blast passing whistle, both of which were answered by the King, and the helm of the former was thrown hard to port, and the vessel continued at full speed ahead until just before the impact, when its helm was thrown hard to starboard in an attempt to parallel the courses of the colliding vessels, which latter maneuver had but just commenced to take effect when the collision occurred. The angle of collision was at least 45 degrees, and probably more. In making this swing the Superior City attained a course nearly at right angles with her original course. This is practically undisputed. It is satisfactorily established, also, that before the alarm was sounded the King had stopped her engines, and immediately upon hearing that signal replied to it

and drove her engines full speed astern, hard-ported her helm, and partially overcame her headway before the impact.

Pilot rule No. II for the Great Lakes provides as follows:

"If, when steamers are approaching each other, the pilot of either vessel fails to understand the course or intention of the other, whether from signals being given or answered erroneously, or from other causes, the pilot so in doubt shall immediately signify the same by giving the *danger signal* of four or more short and rapid blasts of the whistle; and if both vessels shall have approached within half a mile of each other, both shall be immediately slowed to a speed barely sufficient for steerageway, and, if necessary, stopped and reversed. until the proper signals are given, answered, and understood, or until the vessels shall have passed each other."

In view of the established fault of the King, a presumption arises in favor of the subsequent management and operation of the Superior City, which can be rebutted only by clear proof of a contributing fault. As already indicated, there was no necessity for the change to a port to port passing agreement, and the change required the vessels to follow courses crossing one another's bow, and was made when the vessels were but one-half to three-quarters of a mile apart in distance and but 1½ to 2 minutes in time. Because the Superior City had changed her intention with reference to passing, it behooved her navigating officer to be especially alert to observe whether or not the King was complying with the change. Any delay on the part of the King in properly changing her course would require prompt and efficient action. Both the master and the mate of the Superior City noticed that the other vessel seemed to be swinging to port rather than to starboard. The inquiry is, when they observed this. They testify that the alarm was blown immediately upon danger becoming apparent. If this be true, although rule II would require immediate reduction of speed, and stopping, if necessary, some doubt would remain as to whether or not the collision would have thus been avoided. The master of the Superior City insists that to have stopped and reversed his engines at the time when the hard-port order was given and the alarm sounded would not have avoided the collision, in which he is corroborated by other witnesses. The doubt which the court entertains about the correctness of these opinions is resolved in favor of the Superior City, but I am persuaded that he was in doubt about the course of the King prior to blowing the alarm and ordering his helm hard aport and in ample time to have slowed his speed, given the alarm, and stopped, so that collision would have been avoided.

On November 18, 1920, shortly after the catastrophe, the master of the Superior City testified before the government inspectors as follows:

"Q. Captain, did you switch in the alarm bell in the crew's quarters, at the time you sounded your alarm signals? A. Previous to that the forward crew was out on deck, on the forward hatch, when the alarm sounded."

And again later on as follows:

"Q. Your steamer was going at full speed when you put the wheel hard aport? A. Yes, sir.

"Q. How long after that did you put the alarm bells into the crew's quarters? A. All the alarm bells were rung before the alarm whistle. The crew were all out on deck."

It is not overlooked that the giving of such testimony is now denied, and that on his examination before the inspectors, as well as on the trial in this court, this master asserted that the alarm was blown to the King immediately when the danger was apprehended. However, I am convinced, not only that the master testified as above quoted, but that the facts so testified to actually existed. Such testimony as to what occurred upon the vessel clearly outweighs the most vigorous contrary assertions as to the state of the master's mind with regard to his apprehension of danger. It is manifest that danger was apparent to him for some time before blowing the alarm to the King. It was clearly his duty to conform then to rule II. I believe that, when the alarm was blown and the Superior City hard-ported its helm, the vessels were yet in a position to starboard of one another, and not head and head. This is suggested by the angle of collision, and established by the testimony of the officers of the Turner, who were in better position to see than those of the Midvale. How far to starboard of one another they were is doubtful, but that hard-porting of the Superior City's helm and proceeding at full speed was well calculated to increase the danger already apparent, I am convinced. Had rule II been followed when the master of the Superior City became apprehensive of danger, I am satisfied the disaster, with its toll of life and property, would have been averted.

I therefore hold that both vessels were at fault, and a decree accordingly, providing for division of damages and a reference to ascertain the same, may be entered. Proctors for claimants will prepare such decree, serve a copy on proctors for petitioner, and in the event of objection to its form a hearing thereon will be given.